```
               UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF VERMONT
                                     :
MEECHAY CINTRON,                     :
     Plaintiff,                      :
                                     :
     v.                              :    No. 2:05-cv-333
                                     :
DAVID H. SHAUWECKER; DAVID V.        :
LACHANCE; KEITH A. LORMAN; ADAM      :
T. POCKETTE, ANTHONY L. BOSSI;       :
and THE CITY OF RUTLAND,             :
     Defendants.                     :
                                     :
```

**OPINION AND ORDER**

Plaintiff Meechay Cintron commenced this action against Defendants Detectives David Shauwecker and David LaChance and Officers Keith Lorman and Adam Pockette (collectively, "Officers"), Police Chief Anthony Bossi, and the City of Rutland ("City") in state court on November 29, 2005; Defendants timely removed the action to this Court.  On February 8, 2008, the Court held a hearing on Defendant Officers' Motion for Partial Summary Judgment (Doc. 89) filed on March 15, 2007, Defendant Bossi and City's Motion for Summary Judgment (Doc. 87) filed on March 12, 2007, and Defendant City's Motion for Summary Judgment (Doc. 114) filed on October 3, 2007.  At the hearing, the Court reserved judgment on Defendant Bossi and City's Motion for Summary Judgment (Doc. 87).  After the conclusion of the hearing, Defendant Officers moved to bifurcate the trial.  For the reasons

stated below, the Court now GRANTS Defendant Bossi and City's Motion for Summary Judgment (Doc. 87) and DENIES AS MOOT Defendant Officers' Motion to Bifurcate (Doc. 136).

## I.  FACTS

Cintron was arrested in April 2003 and was subsequently charged with conspiracy to distribute narcotics and possession of a firearm.  (Pl.'s Resp. to Def.'s L.R. 7.1(c)(1) Statement ¶ 2.)  Based on Cintron's violations of his conditions of release, the United States Marshall's Service issued a federal arrest warrant.  *Id.* ¶ 8.  On February 10, 2004, LaChance observed Cintron in Rutland, Vermont, and acting pursuant to the warrant, the Officers stopped the vehicle in which Cintron was a passenger.  *Id.* ¶¶ 9, 10.  Cintron attempted to flee on foot; however, he was quickly apprehended.  *Id.* ¶ 12.  Cintron has alleged that the Officers "beat and abused" him while effecting his arrest in violation of 42 U.S.C. § 1983.  (Pl.'s Am. Compl. ¶ 28.)  Police Chief Bossi had no knowledge of nor direct involvement in the incident.  (Pl.'s Resp. to Def.'s L.R. 7.1(c)(1) Statement ¶ 53.)

The material factual issues underlying the present motion concern Cintron's allegations that Bossi and the City have failed to train and supervise the officers of the Rutland Police Department ("RPD").[1]  With regard to the issue of training,

---

[1]  The City argues that Cintron's "Statement of Disputed Material Facts" is not provided for by either F. R. Civ. P. 56 or L. R. 7.1(c), and thus contends that the Court should ignore this

2

Cintron has failed to marshal any evidence supporting his allegations.  To the contrary, the evidence Cintron has offered shows that the RPD conducted training in the use of pepper spray, tazers, and "control and restraint."  (Bossi Dep. 26:3-9, Dec. 14, 2006.)  With regard to the issue of supervision, Cintron has not alleged any deficiencies in the RPD's formalized disciplinary process.  Instead, Cintron alleges that various RPD officers have hindered a number of individuals in filing formal complaints and thus have evaded disciplinary review.  Cintron has provided specific facts regarding the allegations of five complainants.

     First, Cintron has provided the affidavit of Jason Lees.  (Lees Aff. 1.)  Lees describes an incident occurring in 2006 in which he entered the police station and verbally accosted Officer Lorman.  *Id.*  Lees alleges that Lorman responded by slamming him against the wall.  *Id.*  Lees also claims that he spoke with another officer present at the scene, Officer Larson, to see "if anything [could] be done" about the incident.  *Id.*  Larson, in his affidavit, states that a woman identifying herself as Lees' mother stopped by later that day and informed Larson that Lees suffers from "a bi-polar disorder."  (Larson Aff. ¶ 3.)  Larson also claims that he spoke with Lees at the station several days

---

submission.  (Def.'s Reply Mem. in Support of Mot. for Summ. J. 1, n.1.)  However, L. R. 7.1(c)(2) not only provides for but mandates such a statement.  Indeed, it is difficult to imagine how a party could oppose summary judgment if the court simply ignored their responsive pleadings.

later and that Lees "did not indicate that he wanted to make a complaint regarding his encounter with Officer Lorman." *Id*.

Second, Cintron has offered an affidavit from David Sparks. In his affidavit, Sparks states he was arrested in May 2006 by officers not charged in this case, and that he believed the officers used excessive force. (Sparks Aff. ¶ 1.) He states that he called the RPD two to four weeks later, and he believes he spoke to Larson regarding the incident. *Id.* ¶ 2, 3. Sparks claims the officer stated he "would look into the allegations" and that "he would get back in touch" with Sparks. *Id.* ¶ 4. However, Sparks claims that he was never contacted by the RPD. *Id.* ¶ 5. Larson denies having spoken with Sparks. (Larson Aff. ¶ 4.)

Third, Cintron has provided excerpts from the deposition of Debora Eaton. Eaton discusses her arrest in 1997 by officers not charged in this case and her subsequent detention in a detoxification center. (Eaton Dep. 11:6-22, 31:22-32:13, Oct. 17, 2007.) Although her testimony is characterized by recalcitrance, Eaton clearly states her belief that she was treated inappropriately. (Eaton Dep. 31:22-32:2.) In particular, she claims to have received multiple bruises across her body during her arrest. (Eaton Dep. 32:4-10.) She does not, however, claim that she attempted to file a complaint with the RPD, nor that any RPD officers prevented her from doing so.

In addition, Cintron has identified two individuals who allegedly attempted to file complaints that did not involve allegations of excessive force. The first complainant, Mary Mirzaee, reports calling the RPD after her boyfriend's earring disappeared during his arrest. (Mirzaee Dep. 106:8-9, Dec. 13, 2006.) Mirzaee has stated her belief that the unidentified officer with whom she spoke did not take her seriously. (Mirzaee Dep. 107:9-16.)

The second complainant, Lisa Namiot, complained to the RPD that she was being stopped repeatedly by officers who mistook her for her sister. Namiot describes speaking to an officer whom she believed to be Chief Bossi regarding the situation. (Namiot Dep. 21:9-12, Oct. 17, 2007.) She claims that Bossi told her she could not file a written complaint, but that he would handle the situation. (Namiot Dep. 21:2-9.) However, Namiot's description of Bossi, "[s]hort, glasses, . . . [with] a bald spot on top of his head," does not correspond with reality. (Namiot Dep. 18:14-15.) In truth, Bossi is over six feet tall, has a full head of silvery gray hair, and only wears glasses for reading. (Bossi Aff. ¶ 4.)

Lastly, Cintron has drawn attention to a written complaint filed by Cassius Shine many months after Cintron's arrest. Cintron has alleged that Bossi, after receiving and reading the complaint, failed to ask any of the officers implicated about

Shine's allegations.  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 3.)  Cintron goes so far as to claim that Bossi "did nothing." *Id*.  However, Cintron has offered no factual support for these allegations in his pleadings.[2]  The record shows, to the contrary, that Bossi did take action:  Bossi has testified that he believed the Shine document "to be a lawsuit" (Bossi Dep. 66:15, Dec. 14, 2006), and Cintron does not dispute that Bossi promptly referred the matter to the City's attorney and insurer as a lawsuit.[3]  (Pl.'s Resp. to Def.'s L.R. 7.1(c)(1) Statement ¶ 51; Pl.'s L.R.7(c)(2) Statement Ex. 10.)

## II.  SUMMARY JUDGMENT STANDARD

The Court will grant a motion for summary judgment if no genuine issue of material fact exists and, based on the undisputed facts, the moving party is entitled to judgment as a

---

[2]  Cintron provides a citation to a portion of Bossi's deposition.  However, Cintron has failed to include the cited portion of the deposition in his submission:  The asserted factual basis has not been presented to the Court for consideration.  Nonetheless, even if the allegations were properly supported by the record, they would not be sufficient to overcome the legal inadequacies in Cintron's argument.

[3]  The Court notes that the nature of the Shine document supports the reasonableness of Bossi's belief.  The document appears in many ways to be a legal filing: it is captioned as a "Complaint for Abuse of Professional Responsibility;" it charges violations of Shine's civil rights "under the United States and Vermont Constitutions;" it is formatted into 24 numbered paragraphs, signed and notarized; and it indicates that copies have been sent to numerous legal organizations, including the ACLU and the Center for Constitutional Rights, as well as the Department of Justice.  (Pl.'s L.R.7(c)(2) Statement Ex. 10.)

matter of law.  *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).  In deciding whether a genuine issue of material fact exists, the Court interprets all ambiguities and draws all inferences in favor of the non-moving party.  *Id.* (citing *Ford v. McGinnis*, 352 F.3d 582, 587 (2d Cir. 2003)); see also Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

"The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Once the movant has established that there is no material issue of fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."  *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968).  Mere allegations or denials in the non-movant's pleadings will not meet this burden.  *Anderson*, 477 U.S. at 248.

### III. <u>DISCUSSION</u>

#### A. Municipal Liability

In order to establish municipal liability under 42 U.S.C. § 1983, Cintron must demonstrate that the alleged constitutional deprivation resulted from a municipal policy or custom. *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993). Although municipalities may not be held liable under § 1983 purely on the basis of *respondeat superior*, they may be held liable for unconstitutional actions that implement or execute an official policy, ordinance or regulation. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Liability extends to cases in which the city adopts a constitutional official policy but causes its employees to apply the policy unconstitutionally. *See City of Canton*, 489 U.S. at 387.

Liability may be triggered by inaction as well as action, but only if the conduct results from a conscious choice rather than mere negligence. *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'" *Id.* at 126 (quoting *City of Canton*, 489 U.S. at 388). A single incident involving actors below the policymaking

level is generally insufficient to raise an inference of the existence of a custom or policy.  *See, e.g., City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.), cert. denied, 449 U.S. 1016 (1980). "[B]efore the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).

In the context of a failure to train or supervise claim, the Second Circuit has held that the plaintiff must establish three requirements:

> "First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation. . . .  Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . .  Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Walker v. New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).  The first and second requirements may be established through "proof of repeated complaints of civil rights violations . . . followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  *Vann v. City of New York*, 72, F.3d 1040, 1049 (2d Cir. 1995).  The causation requirement may be satisfied by proof that the municipality's

inaction "actually caused or was the moving force behind the alleged violations." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).

In the present case, Cintron falls far short of the requirements for a showing of deliberate indifference.  Nothing in the record indicates that the instant allegations of excessive force are tied to the official policies of the RPD.  As the Court noted earlier, Cintron has failed to mount any meaningful attack on the formal training and disciplinary review procedures employed by the RPD.  Instead, he asserts that the municipality is liable based on the RPD's customary evasion of formalized review.  Cintron specifically alleges a pattern of conduct at the RPD whereby officers stymie individuals in their attempts to file formal complaints of excessive force.[4]  However, Cintron's submissions are grossly inadequate to prove that such action is or was customary.

Even if Cintron could prove the specific facts alleged in his opposition, and even if the Court were to ignore the affidavit of Officer Larson altogether, Cintron's argument is a

---

[4]  The Mirzaee complaint does not involve any allegations of excessive force.  Mirzaee's testimony, if credited, may demonstrate insensitivity on the part of the officer with whom she spoke.  However, the Court does not consider the testimony relevant to the issue of deliberate indifference as presented in this case.  The conduct alleged by Mirzaee could not reasonably put Bossi on notice that RPD officers were using excessive force.  Nor would any supervisory response to this conduct have reasonably prevented the alleged deprivation suffered by Cintron in the instant case.

house of cards: it is built from a handful of allegations which reflect isolated negligent conduct on the part of a few officers. The affidavits of Lees and Sparks show at most that a single RPD officer[5] may have failed on two occasions to assist individuals who made modest efforts to complain about officer conduct.[6]  In both cases, all of the relevant conduct occurred many months after Cintron's arrest.  The only other case involving allegations of excessive force is that of Eaton, whose arrest and detention predates Cintron's arrest by more than seven years. Yet Cintron has not provided any testimony from Eaton indicating that she even attempted to file a complaint.  These incidents are not sufficiently "persistent and widespread" to raise an inference of acquiescence on the part of Bossi and the City.  *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992).

    Cintron has also argued that municipal liability is appropriate based on alleged deliberate indifference exhibited by Bossi in his role as the senior-most official charged with overseeing the functions of the RPD.  However, Cintron has offered little more than empty allegations to support this

---

[5]  It is worth noting that the officer, Larson, is not charged in this matter.

[6]  Neither Lees nor Sparks allege that they made any subsequent efforts to pursue their complaints; nor do either of them indicate that they spoke to any other personnel.  Lees' asserted attempt at complaint comprised a single question to Larson; Sparks' attempt, a single phone call.

charge. Not only is there no proof of conscious violations, the record does not evidence any blameworthy conduct by Bossi. The physical description offered in her deposition testimony makes clear that Namiot has mistakenly identified Bossi. Furthermore, Cintron has admitted that Bossi took timely action on the Shine complaint by referring the matter to the City's attorney and insurer. In sum, Bossi and the City have clearly established that there is no legal basis for municipal liability.

### B.  Supervisory Liability

In order to hold a supervisor liable under § 1983, a plaintiff must show one or more of the following: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003); *see also Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In his amended complaint, Cintron has raised a claim against Bossi asserting supervisory liability based on his alleged gross negligence in training, supervising and disciplining the officers of the RPD and on his failure to "exercise . . . due diligence." (Pl.'s Am. Compl. 69-74.)  In arguing that liability is

appropriate, Cintron has relied on the same claims and assertions articulated with regard to municipal liability.  As the Court has observed above, the record does not evidence any blameworthy conduct by Bossi.  In particular, the evidence concerning Namiot and Shine does not establish that Bossi has failed to take appropriate actions nor that his supervision has been negligent in any way.  Nor has Cintron offered any evidence that Bossi adopted any policies or customs sanctioning the use of excessive force by officers in the RPD.  The Court finds that summary judgment is appropriate on this count.

## IV.  CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendant Bossi and City's Motion for Summary Judgment (Doc. 87) and DENIES AS MOOT Defendant Officers' Motion to Bifurcate (Doc. 136).

Dated at Burlington, Vermont this 6th day of March, 2008.

/s/ William K. Sessions III
William K. Sessions III
Chief Judge

13